## REGAN *v.* NEW YORK.

No. 54.   Argued November 18, 1954.—Decided April 25, 1955.

*Emanuel Redfield* argued the cause and filed a brief for petitioner.

*Aaron E. Koota* argued the cause for respondent.   With him on the brief were *Edward S. Silver, Julius Helfand* and *Jerome C. Ditore.*

*Seymour B. Quel, Daniel T. Scannell* and *Helen R. Cassidy* filed a brief for the City of New York, as *amicus curiae,* urging affirmance.

MR. JUSTICE REED delivered the opinion of the Court.

Petitioner refused to testify before a New York grand jury which was investigating the alleged association of city policemen with criminals, racketeers, and gamblers in Kings County. He was convicted of criminal contempt and sentenced to one year's imprisonment. We granted certiorari, 347 U. S. 1010, to determine whether, under the circumstances here presented, petitioner was deprived of his liberty without due process of law in being punished for his refusal to testify. Cf. *Adamson* v. *California,* 332 U. S. 46, 54.

The following New York constitutional and statutory provisions are essential to an understanding of the case. Article I, § 6, of the Constitution of the State of New York provides, in part, that no person shall "be compelled in any criminal case to be a witness against himself." [1] Section 381 of the New York Penal Law, as it existed at the time of this case, provided that testimony relating to bribery could not be withheld on the ground of self-incrimination, but conferred immunity from prosecution for any criminal activity revealed in such testimony. [2] Section 903 of the Charter of the City of New York provides that any city employee who refuses to sign a waiver of his immunity against subsequent prosecution upon any matter of an official nature about which he is asked to testify shall lose his job and be disqualified from future employment with the city. Article I, § 6, of

---

[1] See also New York Code of Criminal Procedure, § 10.

[2] To the same effect were §§ 584 and 996 of the Penal Law which dealt with the crimes of conspiracy and gambling. These statutes have since been amended. New York Laws 1953, c. 891.

60

the Constitution of the State of New York contains a provision much to the same effect.[3]

Petitioner was first called to testify before the grand jury on March 7, 1951. He was then a member of the Police Department of the City of New York. Prior to being sworn, he signed a waiver of immunity against prosecution.[4] After being sworn, he testified that the waiver had been executed voluntarily and with full understanding as to its meaning. He was given a financial questionnaire and directed to return with it completely

---

[3] It states that: ". . . any public officer who, upon being called before a grand jury to testify concerning the conduct of his office or the performance of his official duties, refuses to sign a waiver of immunity against subsequent criminal prosecution, or to answer any relevant question concerning such matters before such grand jury, shall by virtue of such refusal, be disqualified from holding any other public office or public employment for a period of five years, and shall be removed from office by the appropriate authority or shall forfeit his office at the suit of the attorney-general."

[4] "WAIVER OF IMMUNITY

"I, Michael J. Regan, of No. 3819 Harper Avenue, Bronx, . . . of The City of New York pursuant to the provisions of Section 2446 of the Penal Law of the State of New York, do hereby waive all immunity which I would otherwise obtain from indictment, prosecution, punishment, penalty or forfeiture for or on account of or relating to any transaction, matter or thing concerning which I may testify or produce evidence, documentary or otherwise, before the Grand Jury of the County of Kings, in its investigation above entitled or in any other investigation or other proceeding, before any judge or justice, court or other tribunal, conducting an inquiry for legal proceeding relating to the acts of said John Doe, Michael J. Regan, or of any other person.

"I do hereby further waive any and all privileges which I would otherwise obtain against the use against me of the testimony so given or the evidence so produced upon any criminal investigation, prosecution or proceeding.　(Signed) MICHAEL J. REGAN."

[Witnessed and notarized.]

filled out on March 28, 1951. On March 27, 1951, his connection with the police department was severed. His next appearance before the grand jury was on October 22, 1952, when he was given another questionnaire and instructed to return it in completed form by November 12, 1952. On November 12 he asked for an extension of time and his request was granted.[5] On December 21, 1952, he was once again before the grand jury. On that occasion, he was asked the following question:

> "While you were a plainclothesman in the Police Department of the City of New York did you ever accept or receive any bribes from bookmakers or other gamblers?"

Petitioner refused to answer the question on the ground that his answer might tend to incriminate him. He made a statement in which he claimed that his waiver of immunity was invalid since he had not understood its significance when he signed it, and no one had explained it to him. He expressed doubt as to his status as a witness and his privileges and duties as such.

Petitioner was taken before the County Court of Kings County to clarify his status. It was there held, after a hearing, that the waiver was valid because petitioner had fully understood its significance when he signed it. Petitioner was directed to answer the question which he had been asked. He returned to the grand jury, but persisted in his refusal to testify. He was thereupon indicted for criminal contempt, tried by a jury, and convicted. His conviction was affirmed by the Appellate Division in a short memorandum opinion, 282 App. Div. 775, 122 N. Y. S. 2d 478, and by the New York Court of Appeals without opinion, 306 N. Y. 747, 117 N. E. 2d 921. The Court of Appeals did amend its remittitur to show that

---

[5] The questionnaires never were completed.

the question of whether petitioner had been deprived of liberty without due process of law had been raised and passed upon. 306 N. Y. 875, 119 N. E. 2d 45.

Petitioner contends that this Court must here determine whether the Fourteenth Amendment prevents a State from imprisoning an individual for refusing to give self-incriminatory testimony. In so doing he ignores the crucial significance of the immunity statute in this case. We simply hold that under the circumstances here presented petitioner was not deprived of any constitutional rights in being punished for his refusal to testify.

The immunity statute is crucial in this case because it removed any possible justification which petitioner had for not testifying. If petitioner had not executed a waiver of immunity, it is clear beyond dispute that he would have had to testify; [6] the statute would have provided him with immunity from prosecution on the matters on which his testimony was sought, and thus his testimony could not possibly have been self-incriminatory.[7] The waiver of immunity, although it does affect the possibility of subsequent prosecution, does not alter petitioner's underlying obligation to testify. Much of the argument before this Court has been directed at the question of whether the waiver of immunity was valid or invalid, voluntary or coerced, effectual or ineffectual. That question is irrelevant to the disposition of this case for on either assumption the requirement to testify, imposed by the grant of immunity, remains unimpaired.

First, assume that the waiver was valid. Any testimony which the petitioner gave could then have formed the basis for a subsequent prosecution, and the State would here be punishing the petitioner for his refusal to

---

[6] See *Brown* v. *Walker*, 161 U. S. 591; cf. *Counselman* v. *Hitchcock*, 142 U. S. 547.

[7] Petitioner does not challenge the sufficiency of the immunity provided.

provide such self-incriminatory testimony. But, since we are assuming the validity of the waiver, such a situation would be simply the result of a voluntary choice to waive an immunity provided by the State.

The waiver of immunity from prosecution may, on the other hand, be regarded as invalid. Petitioner argues at some length that the waiver was obtained by a "pattern of duress and lack of understanding." He points to the circumstances attending the signing of the waiver: the size of the room, the number of policemen who simultaneously executed waivers, the speed with which the waivers were obtained, the lack of counsel, etc.[8] He also points to the provisions of the New York Constitution and the City Charter requiring him to sign the waiver or lose his job.[9] In addition he claims that the waiver was stale and thus ineffective since over 21 months had elapsed from the date of its execution to his refusal to testify.

---

[8] There was testimony that the waiver was obtained in a room which measured "10 x 10, or 12 x 12, approximately," containing a desk "about 60 x 2" [sic] and a bench upon which "about five people could sit." About 35 waivers were obtained in a period of 25 minutes. An assistant district attorney made a single speech explaining the nature of the immunity. Immediately after executing the waiver, petitioner testified that he had signed the waiver voluntarily, that it had been explained to him, and that he understood its meaning. Twenty months thereafter petitioner reaffirmed its execution without raising any objection to its validity. It was some twenty-one months after its execution that petitioner challenged the validity of the waiver for the first time. The trial court left the question of the validity of the waiver to the jury. Its verdict of guilty indicates its finding on this matter. The conviction was affirmed by both appellate courts, but we cannot be sure that the affirmance sustained the finding on this matter for the appellate courts may have viewed the question of the validity of the waiver as irrelevant to their decision as we do to ours.

[9] It might be pointed out that, as far as the record shows, this objection was at no point raised below. It appears for the first time in the Petition for Certiorari.

We fail to see where petitioner's arguments lead. If the waiver is invalid, the immunity from prosecution persists, and in the presence of such immunity petitioner's testimony could not possibly be self-incriminatory. It must be remembered that this conviction is for refusing to testify. The invalidity of the waiver may be made a defense to subsequent prosecution, where it would be a proper matter for disposition; it is no defense to a refusal to testify.

Petitioner suggests that his refusal to testify may have been justified by the uncertainty existing at the time he was directed to testify. That uncertainty was only as to whether or not he could be prosecuted for criminal activity which might be revealed in his testimony. As a matter of state law, a defense to the crime of criminal contempt may be provided when such uncertainty reaches a sufficiently high point.[10] But the Constitution does not require the definitive resolution of collateral questions as a condition precedent to a valid contempt conviction. Cf. *Cobbledick* v. *United States,* 309 U. S. 323, 327. The petitioner knew that however the question of the validity of the waiver might be resolved, he was obliged to testify. In persisting in his refusal after being directed to testify he could be punished for contempt. The law strives to provide predictability so that knowing men may wisely order their affairs; it cannot, however, remove all doubts as to the consequence of a course of action.

The judgment below is accordingly

*Affirmed.*

MR. JUSTICE FRANKFURTER concurs in the result.

MR. JUSTICE HARLAN took no part in the consideration or decision of this case.

---

[10] *People ex rel. Hofsaes* v. *Warden,* 302 N. Y. 403, 98 N. E. 2d 579.

MR. CHIEF JUSTICE WARREN, with whom MR. JUSTICE CLARK joins, concurring.

I concur in the opinion and judgment of the Court, but would add that substantial federal questions may arise if the petitioner is again called upon to testify concerning bribery on the police force while he was an officer and if he is thereafter denied immunity as to any offenses related to the investigation.

This Court has never held that a State, in the absence of an adequate immunity statute, can punish a witness for contempt for refusing to answer self-incriminatory questions. A case involving such facts has never been presented here.[1] Nor is this such a case, since New York, by § 381 of the Penal Law, has granted immunity. Petitioner was obliged to answer the questions as would be any witness in the State of New York. If he had signed no waiver, he concededly would have been compelled to testify, since under § 381 of the New York Penal Law he would be entitled to immunity. The fact that he signed a waiver, even assuming it to be invalid as he claims, certainly cannot relieve him from the duty of every citizen to testify. His failure to so testify, therefore, placed him in contempt of court and subject to the punishment accorded him in this case.

However, because it appears from the record to be the intention of the authorities to punish him both for con-

---

[1] Compare *Twining* v. *New Jersey,* 211 U. S. 78 (jury instruction authorizing the jury in a criminal case to draw an unfavorable inference from the accused's failure to take the stand); *Adamson* v. *California,* 332 U. S. 46 (state law permitting prosecutor and trial judge to comment on the accused's failure to take the stand); *Snyder* v. *Massachusetts,* 291 U. S. 97, 105 (denial of permission to the accused to accompany jury on visit to scene of crime); *Palko* v. *Connecticut,* 302 U. S. 319, 325–326 (state statute allowing appeal by State in criminal cases).

tempt for refusal to testify and for bribery if he admits such misconduct, we might eventually be faced with the question of what his rights would be if on a subsequent hearing he should incriminate himself after claiming a privilege against self-incrimination. Petitioner might defend against a prosecution stemming from such involuntary testimony by challenging the validity of the waiver, basing his objection on an asserted federal right against self-incrimination. Such a challenge might well embrace the contention made here of coercion in the procurement of the waiver, as well as the claim that its use well beyond the term of petitioner's public employment would be an unreasonable interference with petitioner's claimed federal right.[2]

Moreover, a state immunity statute—like any other state statute—must be applied uniformly unless there is some reasonable ground for classification; otherwise, the Equal Protection Clause of the Fourteenth Amendment is violated.[3] After a city employee suffers the primary sanction of the constitutional and charter sections—namely, loss of his position—it may well be that the waiver cannot be used to send him to the penitentiary for bribery when the same sanction would not be imposed on other witnesses giving like testimony.

However, as already noted, we do not reach these questions here.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS concurs, dissenting.

In order to keep his job as a New York City policeman petitioner signed a paper waiving immunity he would otherwise have had from prosecution under state law as

---

[2] Cf. *Terral* v. *Burke Construction Co.*, 257 U. S. 529.

[3] See, *e. g.*, *Dowd* v. *United States ex rel. Cook*, 340 U. S. 206, and *Cochran* v. *Kansas*, 316 U. S. 255.

to matters he might testify about before a grand jury. Twenty-two months later, long after he had resigned as a policeman, he was brought before a county grand jury. He was asked whether he had ever accepted bribes while he was a policeman. Acceptance of bribes is a New York felony punishable by ten years' imprisonment. Petitioner refused to answer the questions claiming a federal constitutional and state privilege against self-incrimination. For refusal to answer he was sentenced to twelve months in prison. The Court holds that New York can thus imprison petitioner "for his refusal to provide such self-incriminatory testimony." I do not agree that New York can do this consistently with the Federal Constitution.

For reasons stated on other occasions I believe the Fourteenth Amendment makes the Fifth Amendment applicable to the States. See, e. g., *Adamson* v. *California*, 332 U. S. 46, 68. And the Fifth Amendment accords an unqualified privilege to persons to be silent when asked questions answers to which would make those persons witnesses against themselves. See, e. g., *Blau* v. *United States*, 340 U. S. 159, 161. Even under the other view of the Fourteenth Amendment, that it does not make the Fifth Amendment applicable to the States and that under some circumstances States may compel persons to testify against themselves, this Court has held many times that a State may not convict a person on testimony it coerced from him. *E. g., Leyra* v. *Denno,* 347 U. S. 556, 558; *Ashcraft* v. *Tennessee,* 322 U. S. 143, 155; cf. *Rochin* v. *California,* 342 U. S. 165. Coercing testimony for that purpose is equally obnoxious to the Fourteenth Amendment. However its action is described, the State is seeking to coerce this petitioner to give testimony to help bring about his conviction for crime. For it is certainly coercion to throw a man into jail unless he agrees to testify against himself.

The Court approves the dilemma in which New York places petitioner. He must give evidence which might convict him of a felony or go to jail for refusing to give that evidence. The Court says, however, that petitioner's dilemma is "simply the result of a voluntary choice to waive an immunity provided by the State." There of course may be some doubt as to how "voluntary" this "choice" was. In any event it is a completely novel idea that a waiver device of this kind can destroy constitutional protections. It is nothing more nor less than a wholesale blanket agreement that a person will not claim a constitutional privilege with reference to anything he has ever done in the past or that he may do in the future in connection with his job. So far as I know it has never been held before that the privilege against self-incrimination or any other Bill of Rights safeguard can be bargained away far in advance of the day when needed as protection against the overreaching power of government.

The Court's holding appears to approve a dangerous technique whereby both State and Federal Governments can compel people to convict themselves out of their own mouths. Are we to infer that the Federal Government is now free to compel its millions of employees permanently to waive their privilege against self-incrimination or lose their jobs? Surely private employers are not now free to compel their employees to waive this and other constitutional privileges. This might be highly satisfactory to those who believe that the privilege against compulsory self-incrimination has no proper place in our Bill of Rights. But that provision was designed as a continuing rigid safeguard against ruthless exercise of governmental power.* That it sometimes permits people

---

\* "I would like to venture the suggestion that the privilege against self-incrimination is one of the great landmarks in man's struggle to make himself civilized. As I have already pointed out, the establishment of the privilege is closely linked historically with the abolition

to escape conviction for offenses is no sufficient reason for reading it out of the Constitution. Those who wrote the provision are bound to have known that it would have the effect of making it harder for the Government to convict people accused of crime. Exactly that effect results from all of the procedural provisions of the Bill of Rights, including the right to be heard, to have a lawyer, to be confronted by witnesses, to be informed of the nature of the offense charged, and to be tried by jury. This holding weakens these and other ancient safeguards which to me represent great landmarks in the never-ceasing struggle of men to be free from despotic governmental powers. See dissent in *Feldman* v. *United States,* 322 U. S. 487, 494–503.

I would reverse this case.

---

of torture. Now we look upon torture with abhorrence. But torture was once used by honest and conscientious public servants as a means of obtaining information about crimes which could not otherwise be disclosed. We want none of that today, I am sure. . . .

"If a man has done wrong, he should be punished. But the evidence against him should be produced, and evaluated by a proper court in a fair trial. Neither torture nor an oath nor the threat of punishment such as imprisonment for contempt should be used to compel him to provide the evidence to accuse or to convict himself." Griswold, The Fifth Amendment Today, 7–8.